## COAST CITIES RY. CO. v. DIETZ.
## SAME v. HERZOG et al.

(Circuit Court of Appeals, Third Circuit.
February 17, 1927.)

Nos. 3542, 3543.

Street railroads ⟨⟩117(5, 24)—Negligence of motorman of street car colliding with automobile and contributory negligence held for jury.

In action for damages for injuries from collision of street car with automobile, evidence *held* for jury on question of negligence of defendant's motorman and contributory negligence of plaintiffs.

In Error to the District Court of the United States for the District of New Jersey; William Clark, Judge.

Separate actions by Louis Dietz and by Arthur Herzog, Jr., and another, against the Coast Cities Railway Company. Judgments for plaintiffs, and defendant brings error. Judgments affirmed.

Charles E. Cook, of Asbury Park, N. J., for plaintiff in error.

David M. Klausner and Kinkead & Klausner, all of Jersey City, N. J., for defendants in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. In the court below, Louis Dietz and Arthur Herzog, Jr., and his wife, citizens of New York, brought their several suits against the Coast Cities Railway Company, a corporate citizen of New Jersey, for damages inflicted on them by a street car of the defendant company. The cases were tried together, and verdicts found for the several plaintiffs. On entry of judgments the defendant sued out these writs of error.

On final analysis, the cases narrow down to the question whether the court erred in refusing to give binding instructions for the defendant. A study of the proofs satisfies us that the evidence given on behalf of the plaintiffs was such as compelled the court to submit the case to the jury. In that regard such proofs, it believed, tended to show that, on the morning when the accident occurred, Dietz, accompanied by Herzog and his wife, was driving an automobile at about 18 miles an hour along a public highway which crossed the tracks of the defendant at right angles. There was nothing in distance or weather to prevent him seeing the street car, or in the motorman on the car seeing the automobile. The platform station of the railway was about 28 feet distant, upgrade, from the crown of the crossing, and the contentions of the plaintiffs were that, as the automobile approached the crossing, the street car had stopped and was standing at the station;[1] that suddenly and without

---

[1] As to the car standing at the station, we note, inter alia, the testimony of Dietz, who says:

"Q. Now, you approached this track, and you saw a car standing there at the platform? A. Yes, sir.

"Q. What part of the car did you see first? A. The front end of the car.

"Q. And where were you, what distance back, when you made that observation? A. Why, I should say probably 30 feet or 40 feet.

"Q. 30 or 40 feet back? A. Yes, sir.

"Q. What was the motorman doing? A. Letting off passengers.

"Q. He was in the front part of the car? A. Yes, sir."

warning, and without the motorman[2] looking toward the highway, but, instead, looking down, he started his car[3] on a downgrade, and before the automobile could stop it was struck by the descending car.

This contention was supported by proof on the part of the plaintiffs, and, while it was controverted by the proofs of the defendants, it is clear the court could not side with either contention, and take from the jury the questions of the defendant's negligence, on the one hand, and the alleged contributory negligence of the plaintiffs, on the other. Indeed, to have done so would have been error on its part.

---

[2] As to the motorman not looking, Sanford says:

"I seen the Ford car coming east. As the Ford car was coming east, the trolley car started off, and the motorman had his head down, as if—well, I don't know what he was doing, but he had his head down and turned away. The car had started off, and I see the Ford car—his front wheels was already on the tracks when the trolley car hit him."

Also Field, a witness for defendant, who says: "Well, we just started up ordinarily as any car does, as any trolley car does, very slowly, and I had my eyes on the motorman, who was doing something with his head down, I don't know whether he had anything to do with his machinery, his checking up fares, or anything like that; but he was looking down when he was going over the bridge."

[3] As to the motorman so starting the car, we note, inter alia, the testimony of Dietz, who says:

"Q. Well, now, you came along in that same position; did not alter your course any till you got to the point that you mentioned when you said you saw the car start up. Where were you on the road here when you saw this car start up? A. My front wheels, I should say, were about that far from the tracks.

"Q. Well, that far, would be in feet how many? A. Oh, I should say—

"Q. Two or three feet? A. Two or three feet.

"Q. And you saw this car start up here on this track, coming towards you that way. Is that right? A. Yes.

"Q. You observed it when it started? A. Yes, sir."

And Ryan, who says:

"Q. And did you see the car stop? A. Yes, sir.

"Q. Before the accident? A. Yes, sir.

"Q. What kind of trolley car is it; a one-man trolley car? A. One-man trolley car.

"Q. That is to say, the motorman and conductor are one and the same person? A. All one and the same.

"Q. Did you notice any people getting on or off? A. Two people got off.

"Q. I see. And did you notice the automobile of Mr. Dietz, the Ford? A. I saw a Ford coming up the road; just about when the Ford come to the crossing, the trolley started, and hit the Ford, and turned the Ford around the telegraph post."

Finding no error in the court's charge, or in the submission, or the mode of submission, of these questions to the jury, its judgments are affirmed.